IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANE DOE,

       Plaintiff,                 1:18-CV-00390

     v.                        HON. PAUL L. MALONEY

MICHIGAN STATE UNIVERSITY
and UNIDENTIFIED ROE,

       Defendant.

**BRIEF IN SUPPORT OF**

**PLAINTIFF'S RESPONSE TO MICHIGAN STATE UNIVERSITY'S**

**MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

**ORAL ARGUMENT REQUESTED**

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK

i

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES……………………………………………………………iii

STATEMENT OF FACTS………………………………………………….....1

STANDARD OF REVIEW……………………………………………………....8

LEGAL ANALYSIS……………………………………………………………...9

    VIOLATION OF TITLE IX……….……………………………………….9

        Concise Statement in Support of Position…………………………………..9

        Recipient's Own Actions Violate Title IX……………………………………9

    RELIEF REQUESTED……………………………………………………23

## **TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v Iqbal,* 556 U.S. 662, 678 (2009)…………………………………………………..8

*Bell Atl. Corp. v Twombly,* 550 U.S. 554, 570 (2007)………………………………………8,9

*Canton v. Harris,* 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)………………10

*Davis v. Monroe Cnty. Bd. Of Educ.,* 526 U.S. 629, 119 S. Ct. 1661,
143 L. Ed. 2d 839 (1999)…………………………………………………10,12-13,19-20

*Doe v. Baylor Univ.,* 2018 U.S. Dist. LEXIS 169710………………..……………12-14,19-23

*Doe v Univ. of Tenn.,* 186 F. Supp. 3d 788, 807 (2016)……………………...8-11,13-14,19,22

*Erickson v. Pardus,* 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)…………..9

*Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274 118 S. Ct. 1989,
141 L. Ed. 2d 277 (1998)…………………………………………………………..10, 12-13

*Papasan v. Allain,* 478 U.S. 265, 286 (1986)……………………………………………….9

*Sensations, Inc. v. City of Grand Rapids,* 526 F.3d 291, 295 (6h Circ. 2008)………………9

*Shively v. Green Local Sch. Bd. of Educ.,* 579 Fed. Appx. 348, 352 (2014)………………..9

*Simpson v. Univ. of Colo. Boulder,* 500 F.3d 1170 (10th Cir. 2007)…………9-11-14,19,22-23

**Constitutional Provisions**

Title IX of the Education Amendments of 1972, 20 U.S.C §1681(a)…………....................9, 10

**Court Rules**

Fed. R. Civ. P. 12(b)(6)…………………………………………………………………….9

Fed. R. Civ. P. 12(b)(6)…………………………………………………………………….8

## STATEMENT OF FACTS

### Plaintiff

In the spring of 2015, Plaintiff was and 18-year-old freshman at Michigan State University ("MSU").[1]  On the evening of April 11, 2015, Plaintiff and her roommate went to Harper's Bar in East Lansing, Michigan.[2]  Sometime after midnight, in the early morning of April 15, 2015, most of the MSU basketball team arrived at the bar, including JD1, JD2 and JD3.[3]  The team had just come back to town earlier in the week after participating in the NCAA tournament.[4]  JD1 approached Plaintiff offering to buy her a drink and offering to introduce her to other members of the team.[5]  Being a sports journalism major, Plaintiff was interested in meeting the players so she accepted the drink and the offer to meet the team.[6]  After a while, one of the team members invited Plaintiff a party, lying to Plaintiff by telling her that her roommate was already headed to the party. [7]  Plaintiff rode to the party with JD1 and JD2, the party was taking place at JD2's off-campus apartment.[8]  At this point, JD1 pulled Plaintiff into a bedroom telling her "you are mine for the night."[9] Plaintiff was having difficulty manipulating her hands properly and thought she might have been drugged.[10]

---

[1] *ECF No. 23, PageID 3*
[2] *ECF No. 23, PageID 4*
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *ECF No. 23, PageID 5*
[10] *Id.*

JD2 lured to his bedroom on a pretext whereupon JD2 forcefully threw Plaintiff down on the bed and raped her from behind.[11] Plaintiff could not move or speak.  Once JD2 was done, JD1 and JD3 each came in, also held Plaintiff down and took turns raping her.[12]

The next morning Plaintiff who was extremely distraught, called a friend who took her to the Michigan State University Counseling Center (MSUCC) where she reported the rape to a counselor and completed an intake assessment.[13]  When Plaintiff disclosed to the counselor that her attackers were three notable MSU basketball players, the counselor suddenly left the room and brought in another MSUCC staff member.[14]  The counselor's demeanor completely changed.[15]

The MSUCC staff told Plaintiff that if she chose to report, she faced an uphill battle that would create unwanted media attention and publicity, that this had happened before with many other female students who were sexually assaulted by well-known athletes.[16] The staff told Plaintiff that they had seen a lot sexual assault cases with "guys with big names."[17] The staff made it clear that they had "had many other students in the same situation who have reported, and it has been very traumatic for them."[18]  Plaintiff was told that "if you pursue this, you are going to be swimming with some really big fish."[19]  Plaintiff was so discouraged by the representations made by the MSUCC staff, that she became frightened to the point she felt she could not report the rapes to law enforcement.[20]

---

[11] *Id.*
[12] *Id.*
[13] *ECF No.23, PageID 6*
[14] *Id.*
[15] *Id.*
[16] *ECF No. 23, PageID 7*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*

At no time did any MSU employee notify Plaintiff of her option to report the rapes to the Office of Institutional Equity (OIE), of her Title IX rights, protections or recommendations, to seek STD or pregnancy testing, to have a physical/rape kit exam or seek medical treatment.[21]

**<u>Student Helen</u>**

Helen ("Helen") was a student at MSU in November, 2009 when she was sexually assaulted by two MSU male athletes, one being a prominent football player.[22] Helen reported the assaults to the MSU Police two months later, in January, 2010.[23] Despite giving the MSU Police a detailed description of her attack, no charges were brought against the athletes, the MSU Police did not report the assaults to the Title IX office nor did they inform Helen of her option to do so.[24]

**<u>Student Donna</u>**

Donna ("Donna") was a student at MSU in 2010 when she was sexually assaulted by three MSU basketball players.[25]  Initially Donna did not report the assaults for fear she would be retaliatd against.[26]  However, upon learning that an MSU co-worker had also been sexually assaulted by basketball players, Donna reported her own assault to prevent further assaults from being committed.[27]

Donna told her parents about the assault. Donna's parents, in turn, contacted then Athletic Director Mark Hollis ("Hollis") for assistance and guidance on how to protect Donna and other students.[28]  Hollis assured Donna's parents that Donna would be protected, however, at a subsequent meeting with Donna's parents, Hollis told them there was nothing that could be done

---

[21] *ECF No. 23, PageID 7-8*
[22] *ECF No. 23, PageID 12*
[23] *Id.*
[24] *ECF No. 23, PageID 13*
[25] *Id.*
[26] *Id.*
[27] *ECF No. 23, PageID 13-14*
[28] *ECF No. 23, PageID 14*

about the assaults.[29] In direct violation of MSU protocol, Hollis did not report the assaults to the Title IX office nor the MSU police.[30] The three basketball players were never disciplined by MSU nor were criminal charges brought against them.[31]

Additionally, Associate Athletic Director Alan Haller ("Haller") was present for one or both of the meetings between Hollis and Donna's parents.  Like Hollis, Haller failed to notify the Title IX office or the MSU Police of the assaults on Donna.[32]

**<u>Student Brenda</u>**

Brenda ("Brenda"), a student at MSU was sexually assaulted by two MSU basketball players on August 28, 2010. In an employee-to-employee email dated September 2, 2010, it was stated that "…the alleged perpetrators are high profile student athletes. The Office of the President has been involved."[33]  The then President of MSU was Louella Simon. In another employee-to-employee email, it was stated "What happens with the alleged perpetrators is probably going to depend on other conversations taking place at different levels" and "Nothing about this case has been 'to the letter.'"[34]

At no time was Brenda contacted by the Title IX office until MSU was instructed by the Office of Civil Rights ("OCR") to conduct an investigation.[35]  Even then, the Title IX director inappropriate questioned Brenda on "why didn't [Brenda] just run away?" Brenda did not receive a copy of the Title IX report, she was not informed of the status of the players, or her right to accommodations and counseling.[36]

---

[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Exhibit E; ECF No. 23, PageID 16.*
[34] *Exhibit D*
[35] *ECF No. 23, PageID 17*
[3636] *Id.*

**Unknown Student Lily**

In 2011, MSU sexual assault counselor Lauren Allswede was approached by MSU Attorney Kristine Zayko about a situation involving a football player and MSU's football coach, Dantonio. The conversation with Zayko left Allswede with the distinct impression that a football player had committed a sexual assault but that the incident had not been reported to the police or the Title IX office, but rather was handled internally by Coach Dantonio and the Athletic Department in direct violation of university protocol.[37]

In 2017, three MSU football players were accused of sexually assaulting a freshman student. During a press conference about the incident, Dantonio claimed "this is new ground for us, it's not happened previously."[38] Dantonio's claim that he knew nothing of other sexual assaults committed by MSU football players was clearly not truthful given the 2011 incident.

**MSU SAP Counselor and SAP Director**

1.      Lauren Allsweded ("Allswede) was an MSU sexual assault counselor for seven years.  In a report to MSU Attorney Kristine Zayko in 2011, Allswede noted that five MSU basketball players had been accused of sexual assault in 2010 and expressed her concern about a possible pattern.[39] Zayko did not include this concern in her response to the OCR.[40]  Allswede again raised her concerns regarding a potential pattern during a 2018 NCAA investigation, but again her concerns were given no credence.[41]

---

[37] *ECF No. 23, PageID 18*
[38] *Id.*
[39] *ECF No. 23, PageID 20*
[40] *Id*
[41] *Id*

**2.**      Shari Murgiitroyd ("Murgittroyd") served as director of the Sexual Assault Program at MSU from 2005 through 2010 and supervised the SAP counselors from 2005 through 2015 and provided the following information:[42]

**a.**      Murgittroyd personally knew of three MSU female athletes who were sexually assaulted and who were specifically advised by the athletic department staff to not seek assault counseling through the SAP but to stay within the athletic department.[43]

**b.**      Murgittroyd knew of a "multitude" of female students who had been sexually assaulted by MSU athletes but who were discouraged from reporting their assaults to the Title IX office and law enforcement.[44]

**c.**      MSU employees, and particularly SAP advocates, were questioned whether reports of sexual assault perpetrated by athletes were "valid."[45]

**d.**      SAP employees realized there was tremendous support for athletes and coaches and that there was an undeniable culture of fear about reporting assaults committed by athletes.[46]

**e.**      When SAP or other victim-service agencies within MSU attempted to work with the athletic department or to provide sexual assault training for athletes and coaches, said attempts were largely ignored.[47]

**f.**      MSU staff experienced a culture of minimizing or ignoring sexual assaults which to the lack of action from MSU administrators and investigators and also because of reports

---

[42] *ECF No. 23, PageID 21*
[43] *Id*
[44] *Id*
[45] *ECF No. 23, PageID 22*
[46] *Id*
[47] *Id.*

of retaliation against the victims, especially when the alleged perpetrator was someone who enjoyed institutional power and privilege, particularly athletes.[48]

       **g.**     Athletes in particular, when accused of sexual assault, were not held accountable by MSU or the OIE office.[49]

       **h.**     Such lack of accountability sends a message to the perpetrators that they have a "green light" to perpetrate without consequence.[50]

       **i.**     MSU did not make victim safety a priority.[51]

       **j.**     MSU discouraged victims from reporting sexual assaults.[52]

### OCR Report

In its final report dated September 9, 2015, the OCR concluded its investigation of Student Brenda's assault and concluded:

> "[T]aking into account all of the evidence gather during the investigation, OCR determined that a sexually hostile environment existed for and affected numerous students and staff on campus at the University during the time period covered by OCR's investigation; and that *the University's failure to address complaints of sexual harassment, including sexual violence in a prompt and equitable manner caused and may have contributed to a continuation of this sexually hostile environment* (emphasis added)."[53]

### MSU's Handling of Victim's Medical and Counseling Records

When Plaintiff requested her counseling records in February, 2018, she was asked why she wanted her records and was told that MSU's General Counsel would review her records before they could be released to Plaintiff.[54]  On this same day, Plaintiff requested her records from Olin

---

[48] *Id.*
[49] *Id.*
[50] *ECF No. 23, PageID 23*
[51] *Id.*
[52] *Id.*
[53] *ECF No. 23, PageID 24*
[54] *ECF No. 23, PageID 25*

Health Facility.  Plaintiff was initially told she would have the records in a few days but later was informed that MSU's General Counsel would review her records before they would be released to her. [55] These were Plaintiff's personal medical and counseling requests which are confidential, but MSU refused to give them to Plaintiff until General Counsel reviewed them.  Reviewed them for what is unknown.

After Plaintiff filed her Complaint against MSU, the General Counsel who reviewed her records was the same Counsel MSU assigned to advocate for MSU in the lawsuit.[56]  Moreover, in an effort to publicly discredit Plaintiff, MSU issued a statement disclosing details about Plaintiff's personal life and medical treatment, in violation of both the Family Educational Rights and Advocacy Act (FERPA) and the Health Insurance and Portability Act (HIPAA).[57]

Such actions by MSU certainly have a chilling effect on victims of sexual assault reporting such assaults or seeking assistance from MSU counseling and medical treatment programs.[58]

## STANDARD OF REVIEW

To survive a motion to dismiss based on Rule 12(b)(6), a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[59] "A claim has facial plausibility when the [party] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged."[60] A court must accept all factual content in the pleading as true, however, a court is "not bound to

---

[55] *Id*
[56] *ECF No. 23, PageID 26*
[57] *Id*
[58] *ECF No. 23, PageID 25, 27*
[59] *Ashcroft v Iqbal,* 556 U.S. 662, 678 (2009)(quoting  *Bell Atl. Corp. v Twombly,* 550 U.S. 554, 570 (2007))
[60] *Iqbal, 129* S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555-556).

accept as true a legal conclusion, couched as a factual allegation."[61] "Federal Rule of Civil Procedure 8(a)(2) requires on a 'short and plain statement of the claim showing that the pleader is entitled to relief.'. . . Specific facts are not necessary; the statement need only 'give fair notice of what the claim is and the grounds upon which it rests.'"[62]

## <u>LEGAL ANALYSIS</u>

**VIOLATION OF TITLE IX**

Title IX of the Education Amendments of 1972, 20 U.S.C §1681(a) states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…"

**Concise Statement of in Support of Position**

Plaintiff bases her Complaint on the theory that MSU's policies violated Title IX placing Plaintiff, as a female student, at risk of sexual assault, thus causing her discriminatory harm.

**The Recipient's Own Actions Violate Title IX**

In *Simpson v. Univ. of Colo. Boulder,* 500 F.3d 1170 (10th Cir. 2007), two female students were sexually assaulted in an off-campus apartment by university football players and by high-school students invited for a recruiting visit.[63] The plaintiffs brought suit against the university

---

[61] *Twombly,* 550 U.S. at 555 (quoting *Papasan v. Allain,* 478 U.S. 265, 286 (1986))

[62] *Shively v. Green Local Sch. Bd. of Educ.,* 579 Fed. Appx. 348, 352 (2014) citing *Sensations, Inc. v. City of Grand Rapids,* 526 F.3d 291, 295 (6h Circ. 2008) (quoting *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)).

[63] *Simpson v. Univ. of Colo. Boulder,* 500 F.3d 1170, 1173 (10th Cir. 2007)

under Title IX claiming that the university knew of the risk of sexual harassment of female students in connection with the university's football recruiting program and that the university failed to take any action to prevent further harassment before the plaintiffs' assaults.[64] The District Court granted the university's motion for summary judgement.[65]

On appeal, the 10th Circuit Court determined that the case was not one of student-on-student harassment, but that the Title IX violation arose out of the university's official recruitment program, a program sanctioned and supported by the university.[66]  After conducting an in-depth analysis of the language in *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998), and *Davis v. Monroe Cnty. Bd. Of Educ.,* 526 U.S. 629, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999), the 10th Circuit Court stated:

> "We conclude that a funding recipient can be said to have "intentionally acted in clear violation of Title IX,"…when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient." (citation omitted) *Simpson, p. 1178.*

The *Simpson* Court took note of the discussion in *Canton v. Harris,* 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989), wherein the Supreme Court recognized that a "need could be 'obvious' for reasons other than knowledge of previous incidents within the municipality."[67]

The *Simpson* Court concluded that a jury could infer that the need for more or different training of player-hosts was so obvious, and the inadequacy of training so likely to result in sexual misconduct, that the university's failure was the result of deliberate indifference.[68]

In *Doe v. Univ. of Tenn.,* 186 F. Supp. 3d 788 (2016), several female students were sexually

---

[64] *Simpson,* p. 1174
[65] *Id.*
[66] *Simpson,* p. 1174-1175
[67] *Simpson,* p. 1178-1179
[68] *Simpson,* p. 1173, 1184-1185

assaulted by male athletes.  Some of the assaults took place on campus, others off campus.  Several of the plaintiffs brought not only traditional Title IX claims but also claims that the Court referred to as "Before Claims," those claims arising from the university's actions before the assaults occurred.[69]  These "Before Claims" included allegations that prior to the plaintiffs' assaults, a number of sexual assaults were committed by male football and basketball players, starting as long ago as 1995, that the university, and in particular, the athletic department, knew of the assaults and responded inadequately, attempting to cover up the incidents and failing to report them to, or work with, police and university administrators, failing to implement appropriate or no disciplinary measures, and/or allowing the perpetrators to continue to play on their teams and remain on campus, that the university had engaged in an ongoing pattern of interfering with and stopping the disciplinary process, concealing charges and investigations involving male athletes, discouraging reporting by creating a culture of known tolerance for and protection of sexual misconduct, and that the university had engaged in other practices that fostered the creation of a sexually hostile environment and made female students vulnerable to sexual assault.[70]

The university brought a Motion to Dismiss.  When addressing the enforceability of the "Before Claims," the *Doe* Court discussed the *Simpson* analysis and stated its belief that "the Sixth Circuit would recognize the theory of liability relied on in *Simpson*", ie, the theory that a funding recipient is liable under Title IX if it implements a policy which causes discriminatory harm.[71]

The *Doe* Court determined there were two potential grounds for finding the university liable for its own actions under Title IX:  1) that the university had actual knowledge of prior incidents of sexual assault by male athletes that were sufficient to put the university on notice of

---

[69] *Doe,* p. 791
[70] *Doe,* p. 792-793
[71] *Doe,* p. 805

the risk to plaintiffs, yet was deliberately indifferent in failing to adequately address this risk, and 2) that the university had official policies that rendered the plaintiffs vulnerable to assault.   The first ground was premised on the holdings *Davis* and *Vance* that the university had actual knowledge of prior incidents of sexual assault by male athletes that put the university on notice of the risk of sexual assault to plaintiffs.[72] The second ground was premised on the theory advanced in *Simpson* which extended *Gebser* and *Davis* to allow Title IX liability to arise from official policies of funding recipients that rendered the plaintiffs vulnerable to assault.[73]

When explaining its finding that there were facts to support the second ground, the *Doe* Court acknowledged that while its case did not involve an official policy of hosting a discrete event at which assaults took place such as in *Simpson*, there were nevertheless several other university practices clearly alleged by the plaintiffs sufficient to allow the plaintiffs to proceed under a *Simpson* theory of liability.[74]

In *Doe v. Baylor University*, 2018 U.S. Dist. LEXIS 169710, four female students brought a Title IX action against the university for sexual assaults that occurred between 2012 and 2016. Some assaults were committed by male athletes and some by non-athletes, some occurred on campus, some occurred off campus. The Plaintiffs alleged "traditional" or "post-reporting claims" as well as "heightened risk" claims.[75] These "heightened risk" claims involved allegations that even before the plaintiffs' assaults, the university's practices constituted discrimination that substantially increased the plaintiffs' risk of being sexually assaulted.[76] The plaintiffs alleged that the university's failure to properly investigate sexual assaults chilled reporting and "substantially

---

[72] *Doe,* p. 806
[73] *Id.*
[74] *Id.*
[75] *Baylor*, p. 20
[76] *Id.*

increased" the risk that the plaintiffs and others would be sexually assaulted, that the university

engaged in a pattern and practice of behavior designed to discourage and dissuade students who

had been sexually assaulted from seeking prosecution and protection, and that these policies

constituted disparate treatment of females and had a disparate impact on female students.[77]

In addressing the "heightened risk" claims, the *Baylor* Court initially stated:

> The Supreme Court has repeatedly explained that where the Title IX violation in
> question is caused by an institution's discriminatory policy or custom, courts needs
> not apply the actual notice and deliberate indifference framework typically used in
> cases involving institutional liability for sexual harassment or assault.
> *Baylor,* p. 30-31 citing *Gebser* and *Davis.*

The Court then found that the plaintiffs' "heightened risk" claims "fit squarely within the

official-policy rubric previously identified by the Supreme Court."[78]   Specifically, the plaintiffs

alleged that the university and its staff discouraged the plaintiffs from reporting their assaults,

misled and lied to the plaintiffs about their options for reporting and accommodations under Title

IX, and failed to take steps to ensure that students who did report would not be subjected to

continuing assault or harassment.[79]   The Court found:

> "These alleged facts, construed as true, 'raise a right to relief above the speculative
> level' that Baylor's policy or custom of inadequately handling and even
> discouraging reports of peer sexual assault constituted an official policy of
> discrimination that created a heightened risk of sexual assault, thereby inflicting the
> injury of which Plaintiffs complain."*Baylor, p. 38-39.*

In all of the above cases, *Simpson, Doe v. Univ. of Tenn.,* and *Doe v. Baylor Univ.,* the

courts allowed the plaintiffs to proceed under a theory that a policy, practice or custom of the

recipient itself created a sexually hostile environment for female students that rendered them

vulnerable to sexual assaults.   The facts of each case differed: *Simpson* involved a university

---

[77] *Baylor*, p. 30
[78] *Baylor*, p. 31
[79] *Baylor*, p. 38

supported player-host program for recruits which led to sexual risk for the female hosts. *Doe* did not involve such a program but did involve a long-term pattern of male athletes preying upon female students with the university staff, particularly the athletic department, concealing charges and investigations, attempting to cover up the incidents and failing to report them to, or work with, police and university administrators, failing to implement disciplinary measures, allowing the perpetrators to continue to play on their teams and remain on campus, discouraging reporting by creating a culture of known tolerance for and protection of sexual misconduct, practices that fostered the creation of a sexually hostile environment and made female students vulnerable to sexual assault. In *Baylor*, there was again no discrete event as in *Simpson*, but allegations that nevertheless placed the female students at a heightened risk of harm, ie, that made them vulnerable to sexual assault.  Such allegations included that the university had a widespread practice of mishandling reports of peer sexual harassment, that the university and its staff discouraged the reporting of assaults, misled and lied to victims about their options for reporting the assaults and possible accommodations under Title IX, and that the university failed to take steps to ensure that students who did report would not be subjected to continuing assault or harassment. Taken together, these practices constituted an official policy of discrimination that created a heightened risk of sexual assault to the plaintiffs and other female students.

The above cases also involved multiple plaintiffs while the instant case involves a single complainant, Plaintiff Jane Doe.  This, however, does preclude Plaintiff from establishing that MSU engaged in a practice of discrimination in violation of Title IX. Plaintiff's allegations include:

1)      When a Michigan State University Counseling Center (MSUCC) counselor learned that Plaintiff's sexual assault was perpetrated by three MSU basketball players, the counselor's

demeanor completely changed and Plaintiff was actively discouraged from reporting her assault

to the police, being told that if she did so, she would receive unwanted media attention and an

uphill battle as had happened with many other female students who were sexually assaulted by

well-known athletes.[80]

     2)     MSUCC staff specifically told Plaintiff they have had many other students in the

same situation who did report to the police and it "was very traumatic" for them, that the staff had

seen a lot of "these cases" with "guys with big names."[81]

     3)     The MSUCC staff failed to inform Plaintiff of her options to report the assault the

the Office of Institutional Equity (OIE), failed to inform Plaintiff of her Title IX rights, and failed

to advise Plaintiff to seek a forensic examination or STD or pregnancy testing.[82]

     4)     When Plaintiff requested her MSU counseling and medical records, MSU refused

to release her records to her until said records were reviewed by MSU's General Counsel. [83]

     5)     Upon Plaintiff filing the instant lawsuit, MSU issued a press release in an attempt

to discredit Plaintiff, disclosing to the public confidential information contained in her counseling

and medical records.  Said disclosures were in violation of federal and state law.[84]

     6)      Such actions by MSU created a chilling effect on sexual assault victims seeking

treatment or requesting their confidential records.[85]

     7)     Shari Murgittroyd, a qualified expert in the field of sexual assault trauma and the

supervisor of the MSU Sexual Assault Program (SAP)[86] from 2005 through 2015,[87] provided the

---

[80] *ECF No. 23, PageID 6-7*
[81] *ECF No. 23, PageID 7*
[82] *Id.*
[83] *ECF No. 23, PageID 25-26*
[84] *ECF No. 23, PageID 26-27*
[85] *ECF No. 23, PageID 25*
[86] *SAP is a program that provides counseling to sexual assault victims and that provides training to MSU staff and students.*
[87] *ECF No. 23, PageID 21*

following facts:

a.   When SAP employees disclosed reports of sexual assaults or harassment by athletes, the employees were met with discouragement and were questioned as to whether the reports were valid, leading SAP employees to realize that athletes and coaches had tremendous institutional support from MSU.[88]

b.   The MSU coaches and athletes largely ignored SAP's attempts to train them in the area of sexual assault and harassment.[89]

c.   Professionals at MSU who were not trained in sensitive, trauma-based response discouraged victims from reporting sexual assaults.[90]

d.   There is an undeniable culture of fear of reporting assaults committed by athletes.[91]

e.   Athletes who were sexual offenders were not held accountable for their actions through the OIE or the criminal justice system, sending them a message that victims were not taken seriously and giving the athlete/offenders the "green light" to perpetrate without consequence.[92]

f.   Murgittroyd personally knew of a "multitude" of female students who had been sexually assaulted by MSU athletes but who were discouraged from reporting their assaults to the OIE or law enforcement.[93]

8)   Lauren Allswede, an MSU sexual assault counselor at SAP from 2008-2015 provided the following information:

---

[88] *ECF No. 23, Page ID 22*
[89] *Id.*
[90] *ECF No. 23, PageID 21*
[91] *ECF No. 23,PageED 22*
[92] *ECF No. 23, PageID 22-23*
[93] *ECF No. 23, PageID 21*

a.      If an athlete was involved in a sexual assault, normal protocols were swept away and the complaint was handled by administrators and athletic officials behind closed doors.[94]

b.      Allswede reported a concern over a specific pattern of sexual assaults but her concerns were not addressed.[95]

9)      Student Brenda was sexually assaulted by two basketball players who lived in the same dormitory as Brenda.  An MSU staff member, in an email to another staff member about this incident, stated "…[Y]ou might want to know that the alleged perpetrators are high profile student athletes.  The Office of the President has been involved."[96] Note that during this timeframe, the Louanna Simon was President of MSU. This gives credence to the allegation that administrators became involved when male athletes were accused of sexual misconduct.

10)     MSU's Title IX office did not conduct an investigation into Brenda's assault until the Office of Civil Rights (OCR) required that they do so.  Even then, Brenda was treated poorly by the Director, Paulette Granberry-Russell, who asked Brenda "why didn't you run away?"[97] Clearly the Director lacked appropriate training to interview a victim of sexual assault and attempted to blame the victim and protect the athletes.

11)     Student Donna was sexually assaulted by three MSU basketball player but did not initially report the assaults for fear of retaliation. Donna later reported the assaults when she discovered a co-worker (at MSU) had also been assaulted by basketball players. Donna wanted to prevent further assaults.[98]

12)     Donna's parents reported the assaults to MSU Athletic Director Mark Hollis who

---

[94] *ECF No.23, PageID 10*
[95] *ECF No.23, PageED 20*
[96] *ECF No. 23, Page ID 16; Exhibit E*
[97] *ECF No. 23, PageID 17*
[98] *ECF No. 23, PageID 13-14*

assured Donna's parents he would see that she was protected and that he would speak with the coaches and players. Upon information and belief, MSU Associate Athletic Director Alan Haller was also present.  Despite their duty as mandated reporters under MSU protocol, neither Hollis nor Haller reported the assaults to law enforcement or to the OIE/Title IX Office. No protections were put in place for Donna. The three basketball players were never disciplined and no criminal charges were brought against them.  These allegations conform to the information provided by Shari Murgittroyd and Lauren Allswede, ie, when male athletes were involved, MSU and its high-ranking staff covered it up, that the incident involving Donna's assailants was not an isolated one, that this was how the administration and athletic department handled sexual assaults perpetrated by male athletes.  Such cover ups impeded appropriate criminal and Title IX investigations and allowed the perpetrators to go undisciplined. The logical message such action conveyed to male athletes was that MSU had their backs giving them free reign to perpetrate without consequence.

13)    Student Helen was sexually assaulted by two MSU athletes, one being a prominent football player.  Helen reported the assault in detail to the MSU police, however, no criminal charges were brought, Helen was not advised of her Title IX rights, and the police, again mandatory reporters under MSU protocol, did not report the assault to the OIE.

14)    SAP Counselor Lauren Allswede was approached by MSU Attorney Zayko regarding a football player who was accused of committing a sexual assault on a female student. Apparently, football Coach Dantonio and the Athletic Department internally disciplined the player but failed to report the incident to the police.[99]  Once again, MSU and high-ranking staff failed to report as mandated by MSU protocol, covered the incident up and circumvented appropriate investigations.

---

[99] *ECF No. 23, PageID 18*

All of these allegations, as well as others set forth in her First Amended Complaint, support Plaintiff's position that MSU and its high-ranking staff had a long-term practice that violated Title IX. A practice that covered up the criminal behavior of male athletes instead of addressing said behavior. A policy that, in effect, encouraged the athletes to commit sexual violence knowing there would be no consequences taken against them. A policy that placed female students at risk of harm. A policy that was specifically designed to protect male athletes and MSU athletics in direct violation of Title IX and MSU's duty to protect female students. A policy that created an environment in which Plaintiff and other female students were placed at risk of sexual assault by male athletes "well above and beyond the general risks of student-on-student harassment."[100] A policy that caused Plaintiff discriminatory harm in violation of Title IX.

Defendant argues that the cases which have allowed the pre-assault claims under Title IX "are fundamentally inconsistent with the Supreme Court's rulings in *Gebser* and *Davis*." It is difficult to understand the defense position on this issue. A review of *Gebser* and *Davis,* as well as the in-depth analyses provided in the *Simpson, Doe* and *Baylor* cases makes clear that a recipient may be held liable if a policy of the recipient violates Title IX. Thus, this argument by the defense has no merit.

Defendant also argues that MSU is not responsible for Plaintiff's assault because it occurred at an off-campus party, that MSU cannot be responsible for a student's criminal conduct occurring outside of its substantial control. The defense cites the Supreme Court in *Davis* that a school can be liable only if it "exercises substantial control over both the harasser and the context in which the known harassment occurs."

The *Davis* Court held that Title IX liability could attach when *student-on-student*

---

[100] *Doe,* p. 807

harassment occurred if the recipient had actual notice of the student-on-student harassment and if the recipient's response to the harassment was deliberately indifferent. According to the *Davis* Court, "deliberate indifference makes sense as a theory of liability under Title IX only where the funding recipient has some control over the alleged harassment. A recipient cannot be directly liable for its indifference where it lacks authority to take remedial action."

Thus, in a student-on-student harassment situation, the recipient must have some authority over the harasser and the environment or context in which the harassment takes place. The recipient must have the authority to take corrective action.

In the instant case, Plaintiff is not claiming MSU was deliberately indifferent to student-on-student harassment, a "traditional" claim. Rather, Plaintiff is claiming that MSU's policy or custom violated Title IX, and it was this violation that caused the assault. MSU itself caused the discrimination pursuant to its policy and custom. The cases cited by the Defendant to support its position are not ones in involving an "official policy" claim. In *Baylor, supra,* the defense made the same argument as MSU does here. The *Baylor* court dismissed the argument, noting that none of the cases cited by the defense involved "official policy" claims.[101] Further, the Court stated "that nothing in *Davis* requires an alleged assault to occur on campus in order for a defendant university to have "substantial control." Rather, the *Baylor* Court indicated that under the facts presented in *Davis*, that court determined substantial control was present because "the harasser is under the school's disciplinary authority."[102] Thus, according to the *Baylor* Court, "So too here, Plaintiffs allege that Baylor's disciplinary measures were inadequate and intentionally discriminatory, causing a heightened risk of sexual assault.[103]

---

[101] *Baylor, p. 34*
[102] *Baylor, p. 34-35*
[103] *Id.*

In other words, the fact that a student-on-student harassment takes place off campus does not mean that the school does not have substantial control when it retains disciplinary authority over the harasser and has the authority to correct the situation.  There is no question that MSU retains authority over students who commit sexual violence whether that violence occurs on or off campus.  This is stated explicitly in MSU's sexual violence policy. Moreover, Plaintiff's claim is not a student-on-student traditional claim.  Plaintiff's claim is that MSU's policy violated Title IX. Clearly, MSU has substantial control over its own practices.

Defendant also argues that Plaintiff cannot rely on sexual assaults involving different perpetrators and different victims from prior years to show that MSU was deliberately indifferent. Again, Plaintiff is not bringing a traditional Title IX action, but one involving "official policy." Plaintiff's alleges that MSU had a custom and practice, going back years, of discouraging victims from reporting assaults perpetrated by male athletes, covering up said assaults, failing to report said assaults, failing to properly investigate said assaults, and failing to impose discipline on the perpetrators. Plaintiff alleges it is this custom and practice that created a "heightened risk" leading to her assault.

Lastly, Defendants argues that Plaintiff has failed to show a causal connection between MSU's official policy and Plaintiff's assault. Plaintiff disagrees.

In *Baylor*, the Court was very aware of concerns that application of an official policy rubric involving school-wide risk of assault may be taken to imply that higher education institutions would face near-constant liability.[104]   As such, the Court made clear that "the official policy rubric's extension of liability is limited by its demand that plaintiffs demonstrate the misconduct complained of was 'not simply misconduct that happened to occur [at the school] among its

---

[104] *Baylor, p. 32.*

students' but was in fact caused by an official policy or custom of the university."[105]  The Court noted that to survive a motion to dismiss, the plaintiffs factual allegations must rise to the level of plausibility, not certainty.[106] The Court then found it is "plausible from the facts alleged that Baylor's practice of inadequately handling and even discouraging reports of peer sexual conduct constituted an official policy."[107] The Court then quoted some of the allegations, allegations very similar to those alleged by Plaintiff in the instant case and found that Baylor's policy or custom constituted an official policy of discrimination that created a heightened risk of sexual assault, thereby inflicting the injury of which the plaintiffs complained.[108]

Likewise, in *Doe,* the Court found that while there was no discrete event such as in *Simpson,* there were nevertheless several other practices that were clearly alleged in the plaintiffs' first amended complaint and that it would be up to a trier of fact to determine if any of these practices were, in fact, official policies of the university and, if so, whether they gave rise to the plaintiffs' "before" claims.

In the instant case, Plaintiff has set forth numerous allegations that, taken as a whole, support wide-spread and long-term practices by the university and its high-ranking staff which constitute official policy of the university. Plaintiff has made many similar, if not the same, allegations as those in *Baylor* and *Doe:*  that the athletic department and administration knew of assaults committed by male athletes and responded inadequately, covered up said assaults, failed to report said assaults, failed to implement appropriate disciplinary measures, that the university impeded the investigatory process involving male athletes, discouraged victims from reporting of sexual assaults, fostered the creation of a sexually hostile environment and made female students

---

[105] *Baylor, p. 32 citing Simpson.*
[106] *Baylor, p. 37*
[107] *Id.*
[108] *Baylor, p. 38-39*

vulnerable to sexual.  As with *Baylor* and *Doe*, Plaintiff has pled sufficient facts to support her claim that that MSU's policy and practice constituted an official policy of discrimination that placed Plaintiff and other female students as risk of sexual assault, thereby causing Plaintiff's injury.

**RELIEF REQUESTED**

For the foregoing reasons, Plaintiff, by and through her attorneys, Karen Truszkowski and Julie A. Jacot, hereby requests that the Court deny Defendant MSU's Motion to Dismiss Plaintiff's Amended Complaint.

DATED: 01/31/19

/s/ *Karen Truszkowski* (P56929)
Karen Truszkowski
Temperance Legal Group PLLC
503 Mall Court #131
Lansing, MI  48912
1-844-534-2560 phone  / 1-800-531-6257  fax
Karen@temperancelegalgroup.com

/s/ *Julie A. Jacot* (P43443)
Julie A. Jacot
Jacot Law PLLC
1044 N. Irish Road, Suite A
Davison, MI  48423
810-653-9526 phone
810-658-2444 fax
juliejacotlaw@gmail.com

*Attorneys for Plaintiff*